

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00097-CV

IN THE INTEREST OF H.C., A CHILD

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 18C0193-102

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens
Dissenting Opinion by Justice Burgess

OPINION

The Department of Family and Protective Services (Department) filed a petition to terminate Kara's parental rights to her child, Harrison,[1] on the ground that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Harrison's return after he had been in the temporary managing conservatorship of the Department for not less than nine months as a result of his removal for abuse or neglect. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (Supp.). The trial court found that this ground for terminating Kara's parental rights existed and that termination of her parental rights was in Harrison's best interests.

On appeal from the termination of her parental rights, Kara argues that the evidence is legally and factually insufficient to support the trial court's best-interests finding. Because we find the evidence sufficient to support the trial court's conclusion that terminating Kara's parental rights was in Harrison's best interests, we affirm the trial court's judgment.

## I. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at

---

[1]To protect the confidentiality of the child involved, we refer to all parties by pseudonym. *See* TEX. R. APP. P. 9.8(b)(2).

2

trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have

reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002))). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "[I]n making this determination," we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 26).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights."

4

*Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

## II.      Factual and Procedural Background

Harrison was born to parents Kara and Sam in October 2017.  After receiving reports of methamphetamine use, the Department filed a suit affecting the parent-child relationship against Kara and Sam and obtained temporary managing conservatorship of Harrison on February 21, 2018.

In addition to Harrison, Kara has two children from two prior relationships.  When the Department initiated this matter, Kara's six-year-old daughter, Emmy, was placed with her biological father until the resolution of the case.  Kara's fourteen-year-old daughter, Lucy, had already moved in with Kara's mother before Harrison was born because Lucy did not like Sam.

At trial, Kara testified that she was in a relationship with Sam for two and one-half years before the case was initiated and had been using methamphetamine for two years.  Although she had used methamphetamine once or twice when she was nineteen, forty-year-old Kara testified that she had not tried the drug again until she met Sam.  Kara testified that she also used marihuana for approximately one year.

While Sam failed to participate in the Department's family service plan, Kara completed all court-ordered services, parenting classes, psychological assessments, and counseling, and she attended Narcotic Anonymous meetings.  Her success prompted Harrison's monitored return to Kara on September 18, 2018, but the trial court also ordered Kara to have "no contact with [Sam]." In November, the trial court terminated Kara's monitored return, and Harrison was placed back

5

into foster care because Kara was having contact with Sam, who was described by the trial court as "an active meth user."

The trial court's no-contact order remained in place throughout the pendency of the case. Because it believed Kara had complied with that order, the Department recommended Harrison's return to Kara. The final hearing began in January 2019 and showed that Kara had not complied with the trial court's order.

Kara lived next door to Sam's parents. Chantal Finley, a Department conservatorship worker, testified that she made an unannounced visit to Kara's home in September 2018 and that Sam came to Kara's home during the visit. According to Finley, Sam was very angry, threatened her, and took photos of her and her car. Finley described the situation as "just horrible." She also informed the trial court that Kara had other contact with Sam in violation of the court's order, including on the weekend before the January hearing, when Sam was seen working in Kara's yard.[2]

According to Finley, Kara had not shown the ability to keep Harrison from Sam. As a result of Sam's "previous terminations, his non-compliance with this case, and his behaviors," Finley said she was concerned that Harrison was not safe in Sam's presence. Even so, Finley testified that she was not asking the Court to terminate Kara's parental rights because she believed it would not be in Harrison's best interests. Finley said she had no concerns with Kara's parenting, mental health, or drug use. When asked if it was in Harrison's best interests to remain with Kara, Finley testified, "If she can abide by the Court order and not allow [Sam] access to the child."

---

[2]Finley testified that she received photos via text message of Sam working in Kara's yard on the weekend before trial, but clarified that Kara was not in the photos.

Harrison's foster mother, Beth, had provided Finley with the photo of Sam working in Kara's yard. She believed that Kara was home at the time because her car was in the photo, but testified that Harrison was with her, not Kara, when Sam was doing the yardwork. Beth testified that Sam was a danger to the child, but could not say why she believed Harrison would be harmed by contact with Sam. According to Beth, Kara showed an inability to keep the child from Sam and believed there would be continued contact between the two as long as Kara lived next door to Sam's parents.

That said, Beth echoed Finley's testimony that it was not in Harrison's best interests for Kara's parental rights to be terminated. Beth testified that Harrison and Kara had a good mother-son bond, that Kara loved Harrison, that she had no objection to Kara's parenting, and that she had not seen Kara cause any harm to the child. Beth said, "I would be okay with the child living with his mother if she didn't live next door to [Sam's] parents." To facilitate the child's return, Beth testified that, although there were no pleadings for joint managing conservatorship, she would not mind being involved while the Department found permanency for the child, if necessary.[3]

Cynthia Henderson, a Court Appointed Special Advocate (CASA), testified that it was not in Harrison's best interests to terminate Kara's parental rights. Henderson testified that Kara and Harrison were bonded to each other, Harrison "seem[ed] to love [Kara] and kn[e]w who she [was]," everything was well when she visited Harrison at Kara's home, and Harrison had "a good place in the home." Henderson also testified that Kara's drug tests were negative and that her only concern was whether Kara could protect Harrison from Sam. She believed Kara could adequately

---

[3]Beth testified that Harrison was also bonded with the foster family.

7

care for and provide for Harrison if Sam were not "in the picture." For these reasons, Henderson testified that terminating Kara's parental rights to Harrison was not in the child's best interests and suggested that Kara and Beth could share joint managing conservatorship of the child.

Kara admitted that she had contact with Sam when she walked next door to deliver his mail. She also had a long talk with him after Finley's unannounced visit to explain that he was also required to complete a family service plan. Kara testified that she never invited Sam to her home to do yard work and was not aware that he was at her home working in her yard on the weekend before trial. She testified that she would be willing to abide by the trial court's no contact order should Harrison be returned to her.

After hearing this evidence, the trial court reinstated Harrison's monitored return to Kara and reemphasized that Kara was to have no contact with Sam. Because Kara had already violated the prior no-contact order, the trial court found Kara in contempt, ordered her jailed for 180 days, but suspended the commitment until the final resolution of the case. The trial court announced that it would continue the final hearing and clarified that neither party would have to rehash the evidence presented at the continued hearing.

Kara did not heed the trial court's warnings. After several witnesses testified that Kara was having contact with Sam, Harrison was returned to foster care, and the date for the continued final hearing was set. This time, the Department was seeking termination of Kara's parental rights.

At the October 2019 continued final hearing, Kara admitted that she was jailed in April 2019 for 107 days "[b]ecause [she] violated the no contact order with [Sam]," who had still not

8

started his family service plan. Since her release from jail, Kara had moved in with her mother and Lucy and swore she had no contact with Sam, who did not have her new phone number.

Kara's mother, Dawn, described Kara as a loving, caring, patient mother. Dawn testified that she was surprised to learn that Kara was on methamphetamine at the beginning of the case. Before Kara's drug use, Dawn said she had no concerns about Kara's ability to care for her children and provide a safe and stable environment for them. According to Dawn, Kara had never been involved with illegal drugs before meeting Sam. She testified that Kara had not had contact with Sam after moving into her three-bedroom, one-bathroom home and that it was not in Harrison's best interests for Kara's parental rights to be terminated.

Kara admitted that she tested positive once for methamphetamine at the beginning of the case but said, "I'm completely clean of drugs. I couldn't say that years ago even with my other kids," implying that this was the first time in years she could say that she was sober. Kara pointed to her success in completing the family service plan and assured the trial court that her remaining drug tests were negative because she stopped using drugs.

Kara had not seen Harrison, who was just shy of his second birthday, for the six months preceding the hearing because of her violation of the court's order but testified that it was in Harrison's best interests to remain with his family. Kara testified that she was making approximately $200.00 per week as a dog groomer, was also actively looking for other employment, and would be able to provide for Harrison's needs. Kara also said that Harrison would have his own room if he were returned to her.

9

The trial court reflected on its notes from prior hearings before making its ruling and placed those notes in the record. The notes from an April 2018 hearing showed that Sam was in jail and that Kara was "still having some issues with marijuana and the meth." The trial court recalled that it had twice given Kara monitored return of Harrison but was forced to place the child back into foster care after witnesses testified about Kara's violations of the no-contact order. The trial court found that Lucy "had to go live with [Kara's] mother because . . . [Kara] chose to live with [Sam]." Ultimately, the trial court found it in Harrison's best interests to terminate Kara's parental rights to Harrison because it concluded Kara had chosen Sam over her children.

Kara argues that the trial court's best-interests finding was not supported by sufficient evidence.

## III.    Analysis of the *Holley* Factors

"There is a strong presumption that a child's best interest is served by keeping custody in the natural parent." *In re W.C.*, 98 S.W.3d 753, 757 (Tex. App.—Fort Worth 2003, no pet.). In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re N.L.D.*, 412 S.W.3d 810, 818–19 (Tex. App.—Texarkana 2013, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (Supp.). "It is not necessary to prove all of these

factors as a condition precedent to parental-rights termination." *E.J.Z.*, 547 S.W.3d at 351 (citing *C.H.*, 89 S.W.3d at 27). "Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis." *Id.* (citing *C.H.*, 89 S.W.3d at 28). "The best interest analysis may [also] consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence." *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

We find the first *Holley* factor to be neutral because Harrison was too young to express his wishes. *See In re S.L.W.*, 529 S.W.3d 601, 613 n.9 (Tex. App.—Texarkana 2017, pet. denied).

We find the third, fifth, sixth, and seventh *Holley* factors in Kara's favor. No one testified that Kara posed an emotional or physical danger to Harrison. Kara completed every requirement of the Department's family service plan and had provided Harrison with a stable home. While the Department had no permanent plan for Harrison, Kara's plan was to have Harrison live with her, Dawn, and Lucy in Dawn's appropriate home.

Even so, the remaining *Holley* factors weigh in favor of terminating Kara's parental rights. "When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *In re K.L.M.*, No. 06-17-00110-CV, 2018 WL 988394, at *5 (Tex. App.—Texarkana Feb. 21, 2018, no pet.) (mem. op.). We may also consider "the amount of contact between the parent and child." *Id.*

As for the second *Holley* factor, the evidence at trial showed that Kara cared for Harrison, loved him, and provided for his emotional and physical needs when the child was in her possession. Because of her repeated violations of the trial court's orders, Harrison was placed into foster care

11

several times. Kara was jailed on April 25, 2019, and had not seen Harrison as of the October 9 continued trial. She admitted that, as a result of her poor choices, she was unable to care for Harrison for a quarter of his life. Given the testimony showing that Kara had not provided for Harrison's emotional and physical needs for several months before trial, we find this factor weighs in favor of terminating Kara's parental rights.

Next, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re B.K.*, No. 06-18-00037-CV, 2018 WL 3892860, at *4 (Tex. App.—Texarkana Aug. 16, 2018, pet. denied) (mem. op.) (quoting *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet. denied)). Kara had a history of drug abuse. She admitted that she used methamphetamine with Sam for a two-year period and had also used marihuana. Although all of Kara's drug tests were negative, except for the initial drug test administered in February 2018, the trial court's notes from an April hearing showed that Kara was still using drugs. "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *K.L.M.*, 2018 WL 988394, at *5. While the record demonstrated that Kara was sober by the time of trial, a parent's "'recent turnaround' . . . is not determinative." *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *9 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.); *see In re A.R.G.*, No. 14-18-00952-CV, 2019 WL 1716262, at *10 (Tex. App.—Houston [14th Dist.] Apr. 18, 2019, no pet.) (mem. op.).

Kara testified that she had not used methamphetamine for approximately twenty years but began using the drug again after she met Sam. At trial, the court described Sam as a known drug user. Even though his parental rights to Harrison were at stake, and his parental rights to other

12

children had previously been terminated, Sam failed to participate in a family service plan. Finley, Beth, and Henderson all believed Sam to be dangerous and testified that they were concerned about Kara's contact with Sam and Harrison's possible exposure to him.

Finley, Beth, and Henderson all testified in January 2019 that Kara was unable to keep away from Sam, and they expressed concern about her ability to protect Harrison from him. Finley said it was in Harrison's best interests to remain with Kara, only "[i]f [Kara could] abide by the Court order and not allow [Sam] access to the child." Henderson believed Kara could adequately care for and provide for Harrison only if Sam were not "in the picture." Because of her history of drug use with Sam, the trial court could have concluded that Kara was at risk of relapse if she continued to see him. Kara showed a lack of parental ability when she continued her contact with Sam and proved that it was not in Harrison's best interests to remain in her care. She had no excuse for her repeated violations of the no-contact order, which indicated that the existing parent-child relationship was inappropriate.

The trial court gave Kara multiple opportunities to show her fitness as a parent when it twice granted her a monitored return of the child. Kara did not take advantage of those chances and risked her parental rights to Sam over and over. The trial court found that Kara's relationship with Sam was not appropriate because she chose Sam over her children when she (1) allowed Lucy to move out of the home because she did not like Sam and (2) repeatedly violated the trial court's no-contact order even though she knew termination of her parental rights to Harrison could result.

We find that the fourth, fifth, eight, and ninth *Holley* factors weighed in favor of terminating Kara's parental rights to Harrison. As a result, we conclude that, despite Kara's

13

"seeming turn-around, the totality of the evidence is such that a reasonable fact[-]finder could form a firm conviction or belief that termination of [Kara's] parental rights [wa]s in [Harrison]'s best interest." *A.R.G.*, 2019 WL 1716262, at *10. Because we find the evidence legally and factually sufficient to support the trial court's best-interest finding, we overrule Kara's points of error.

## IV. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

## DISSENTING OPINION

I do not find clear and convincing evidence in this record establishing that termination of Kara's parental rights was in Harrison's best interest, and the law does not allow me to simply take the Department's word for it. Accordingly, I respectfully dissent.

## I. Introduction

As the majority notes, the trial court found that grounds existed for terminating Kara's parental rights based solely on Section 161.001(b)(1)(O) of the Texas Family Code, which allows termination where there is clear and convincing evidence that a parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the

14

child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. §161.001(b)(1)(O).

The trial court then found that termination of Kara's parental rights was in Harrison's best interest. The evidence in this case establishes that Kara complied with every provision of every court order in this case but one: that Kara have no contact with Sam. The evidence also establishes that but for those violations, the Department, CASA, and the ad litem recommended reunification between Kara and Harrison  Accordingly, we must review the record to determine whether the evidence establishes that termination of Kara's parental rights based on alleged violations of the no-contact orders was in Harrison's best interest. Because I believe that the Department failed to present clear and convincing evidence establishing that termination of Kara's rights was in Harrison's best interest, I believe we should reverse the trial court's judgment and render judgment in favor of Kara.

## II.     What Evidence is Actually in the Record Before Us?

Understanding exactly what is contained in this record is key to understanding why the Department's case is insufficient. In *In re E.W.*, we held that

> "[i]t is . . . 'inappropriate for a trial judge to take judicial notice of testimony even in a retrial of the same case.'" *B.L.M.[v. J.H.M., III*, No 03-14-00050-CV,] 2014 WL 3562559, at *11 [(Tex. App.—Austin July 17, 2014, pet. denied) (mem.op.)] (quoting *Guyton [v. Monteau]*, 332 S.W.3d [687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.)]. "'In order for testimony from a prior hearing or trial to be considered in a subsequent proceeding, the transcript of that testimony must be properly authenticated and entered into evidence.'" *Id*. (quoting *Guyton*, 332 S.W.3d at 693). Thus, "[a] trial judge may not even judicially notice testimony that was given at a temporary hearing in a family law case at a subsequent hearing in the same cause without admitting the prior testimony into evidence.'" *Id*. at *12

15

> (quoting *Davis* [*v. State*], 293 S.W.3d [794, 797–98 (Tex. App.—Waco 2009, no pet.).].

*In re E.W.*, 494 S.W.3d 287, 297 (Tex. App.—Texarkana 2015, no pet.) (first and sixth alterations in original).

The reporter's record in this case consists of fourteen volumes. The first volume is the master index, and the fourteenth volume is the exhibit volume. Of the remaining twelve volumes, only volumes 8, 10, and 13 contain any sworn witness testimony at all, but only volumes 8 and 13 contained trial testimony. Volumes 2 through 7, 9, and 11 through 12 are transcripts of review hearings consisting only of statements by the trial court, the attorneys, the ad litem, and the CASA representatives. Volume 10 is a transcript of a review hearing that contained some sworn testimony. However, none of the transcripts from those hearings were transcribed and admitted at the trial. Therefore, the trial court could not take judicial notice of anything said at those hearings, and we must look solely to Volumes 8 and 13 for clear and convincing evidence that termination of Kara's parental rights was in Harrison's best interest.

## III. To What Degree Did Kara Actually Violate the No-Contact Orders?

It is true that Kara does not challenge the sufficiency of the evidence supporting the trial court's determination that she violated Subsection (b)(1)(O) by failing to comply with the no-contact orders. Nevertheless, as the majority notes, the eighth *Holley* factor calls for us to consider "the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one." *Id.* at 300 (quoting *In re N.L.D.*, 412 S.W.3d 810, 818–19 (Tex. App.—Texarkana 2013, no pet.)). In that regard, it is relevant to look at the nature of Kara's failure to comply with the no-contact orders. For example, did she flagrantly violate the orders by initiating contact

herself, or was she powerless to stop Sam from initiating contact? If Kara did not willfully and flagrantly violate the court orders, but was merely powerless to stop Sam from contacting her—and if there is insufficient evidence to show that Kara endangered Harrison's health and safety by doing so—it would strongly indicate that her acts were not so serious as to "indicate the existing parent-child relationship is not a proper one." *Id*. (quoting *N.L.D.*, 412 S.W.3d at 819). To resolve this question, we must examine the record in detail.

## A. Summary of Evidence Regarding Contact Between Parents

The testimony from Volumes 8 and 13 established only three episodes of contact between Kara and Sam after the trial court imposed the no-contact order.

### 1. September 14, 2018, Unannounced Home Visit

The first episode occurred on September 14, 2018, when Department Conservatorship Worker Chantel Finley performed an unannounced visit to Kara's home. On that occasion, Sam appeared and was angry and threatening towards Finley. Finley testified that Sam told her she did not know who he was, took Finley's photo, and also took photos of Finley's car. Finley described the episode as "just horrible."

### 2. Weekend Prior to the January 31, 2019, Hearing

The next episode of contact between Kara and Sam occurred on the weekend prior to the January 31, 2019, hearing. Finley testified that she had received photographs of Sam doing some kind of yard work in Kara's front yard. The CASA representative, Cynthia Henderson, testified that she had seen the photographs and that they showed Sam in Kara's yard. The foster mother testified that she had obtained the photographs reflecting Sam's yard work from her father-in-law,

17

but she said she was not alleging that Harrison was present in the home during that time. She also stated that she had heard there was a lot of contact between them, but she had not personally observed them together.

### 3. Conversation After the September 14, 2018, Unannounced Visit

Finally, Kara testified that she talked to Sam on September 14, 2018, after Finley's unannounced visit was over. When asked if she had ever had a conversation with Sam about the services he was required to perform, she testified, "I told him what I had to do, you know, after -- after September 14th, I told him everything I had to do. We had a long talk and I told him everything I had to do." When asked if Sam was aware that he was required to complete a similar service plan, Kara testified, "I told him. He asked me and I would say call her, this woman."

### B. Analysis

### 1. The Record Fails to Establish that Kara Initiated any of the Contact Identified in the Record

Regarding the first episode on September 14, 2018, Finley admitted on cross-examination that Sam was not in Kara's home when she first arrived, that Sam came in after she was already inside the house, that Kara did not invite Sam in, and that Sam was not there prior to her arrival. Therefore, there is no evidence establishing that Kara initiated the contact that occurred on September 14. If anything, the record suggests that Sam barged in on his own.

Regarding the second episode on the weekend prior to the January 31, 2019, hearing, Finley admitted on cross-examination that neither Kara nor Harrison were in the photograph and that she was not aware of any actual contact between Kara, Sam, and Harrison on that date. Henderson admitted on cross-examination that she had no personal knowledge that Sam had continued to

18

come around Kara's house but was relying on the photographs depicting him doing yard work there. Also, the foster mother testified that she had not seen any harm to Harrison based on any contact, alleged or real. Thus, not only is there no evidence establishing that Kara initiated this contact, there is no evidence that Kara had any contact with Sam that day.

Regarding the third episode after the Department's unannounced visit on September 14, 2018, there is once again no evidence that Kara initiated that contact. If anything, the record suggests it occurred after Sam barged in during Finley's unannounced visit and while Finley was still present. Consequently, not only is the evidence that Kara violated the no-contact orders by initiating contact with Sam less than clear and convincing, there appears to be no evidence to support that finding at all.

### 2. The Majority's Reliance on Kara's Conversations with Sam About This Proceeding Is Misplaced

Nevertheless, the majority holds that "Kara admitted that she had contact with Sam when she walked next door to deliver his mail. She also had a long talk with him after Finley's unannounced visit to explain that he was also required to complete a family service plan." The majority points to those conversations as evidence that she initiated contact with Sam in violation of the trial court's no-contact orders. This over-simplifies the facts a bit.

Finley testified that she believed Sam had notice of these proceedings because she sent certified letters containing the pleadings in this case to Sam at Kara's home address. Kara testified that "when they would mail [her] those letters and they [got] sent both to [her] house . . . [she] would sign for them, and then [she] would take them over to his mom and dad's house." When Sam's counsel pointed out to Finley that Kara was ordered not to have contact with Sam, Finley

19

replied by saying, "[B]ut they had contact." Accordingly, the only logical conclusion to be reached from this testimony is that the Department sent the certified letters to Sam at Kara's house with the intent and the expectation that he would receive them from Kara. Rather than constituting evidence that Kara initiated contact with Sam in violation of the trial court's no-contact orders when she delivered his certified mail to his parent's house, it is more accurate to say that the Department itself initiated this contact by sending the certified letters to Kara's house in the first place.

In addition, the context of the evidence establishes that Kara's conversations with Sam about his responsibilities in this case occurred during the September 14th unannounced visit, after Finley left, and while Sam was still there. Given the fact that Sam arrived uninvited and was threatening to Finley when he was there, it is not reasonable to assume that Kara had the ability to make him leave. And, as will be shown below, the Department itself did not believe she had that ability. In addition, Kara's explanation to Sam about what he was required to do in this case was fully consistent with the Department's goals for Sam at that time. It can hardly be said to constitute due process to allow the Department to initiate contact between Kara and Sam by sending his certified letters to her house and then, when she delivered those letters to Sam as the Department intended, use that contact as evidence that Kara violated the trial court's no-contact orders and should have her parental rights terminated. Likewise, it is hardly due process to penalize Kara for providing Sam with the information the Department wanted him to receive. Thus, when we look

20

at this evidence in its proper context, it does not support a conclusion that Kara initiated any contact with Sam.[4]

### 3. In Other Civil Contexts, Courts Hold Parties Responsible for Their Own Acts or Omissions, Not for Failing to Control the Actions of Others Over Whom the Party Has no Control

In the absence of clear and convincing evidence establishing that Kara initiated any of the contact with Sam, then Kara could only have violated the no-contact orders by failing to prevent Sam from having any contact with her. Several references in the record indicate that this is precisely how the Department and the trial court interpreted the evidence. In response to questions from the Department's attorney, Finley testified as follows:

> **Q. Has [Kara] demonstrated the ability to keep [Sam] away from this child?**
>
> **A. No, sir.**
>
> **Q. Has she demonstrated the ability to keep him away from her?**
>
> **A. No, sir.**
>
> Q. Is that an ongoing concern for you as the worker in this case for the safety of the child?
>
> A. Yes, sir.

(Emphasis added). Likewise, in response to questions from the ad litem, the foster mother testified:

> Q. . . . . Do you have continu[ing] concern about [Kara's] ability to protect the child from [Sam]?
>
> A. I think so long as they live next door to each other that they're going to have contact.

---

[4]And, even if it did support that conclusion, the fact that the Department initiated this contact is a circumstance which mitigates against a best-interest finding. *See infra* note 8.

21

**Q.     Has she shown an ability to keep him away?**

**A.     No.**

Q.     Do you think that's dangerous to the child?

A.     Yes.

(Emphasis added). In addition, at the November 8, 2019, hearing, the trial court told Kara, "[Y]ou've jeopardized the health, safety, and welfare of the child by allowing this person that we've talked about being a danger to the child to be around him."

In other civil cases, courts lack the power to coerce or punish a party's failure to control other actors where there is no evidence that the party had the ability to control those actors.[5] For example, in *Ex parte DeWees*, the Texas Supreme Court granted a writ of habeas corpus discharging the relator from jail for contempt of court arising out of a child custody dispute where the relator, who was jailed, could only purge her contempt by producing the child in open court. *See Ex parte DeWees*, 210 S.W.2d 145 (Tex. 1948). The Supreme Court concluded that the Texas contempt order was invalid and held that imprisonment to coerce compliance with a court order "must relate to something to be done by the defendant by the doing of which [s]he may discharge [her]self." *Id*. at 147; *see also Ex parte Thetford*, 369 S.W.2d 924, 926 (Tex. 1963) (holding that "[a]ll of the testimony at the contempt hearing shows that [father] . . . took possession and control of the children. . . . As a condition to purging themselves of contempt, [grandparents] are required

---

[5]To be clear, I do not question the validity or wisdom of no-contact orders such as the ones in this case. As I will explain below, I merely point out that to base termination of a parent's parental rights on her failure to comply with such orders in the absence of evidence that she initiated the prohibited contact, there must be evidence of other facts beyond the mere violation.

. . . to perform an act which . . . is impossible of performance"). Likewise, "a party to a civil suit cannot be liable for the intentional wrongful conduct of his attorney unless the client is implicated in some way other than merely having entrusted his legal representation to the attorney. *Bradt v. West*, 892 S.W.2d 56, 76 (Tex. App.—Houston [1st Dist.] 1994, pet. denied). Also, a party cannot be liable for the actions of an employee in tort cases where there is no evidence the employer has the right to control the details of the work performed by the employee. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002).

Given this precedent in other civil actions, and in light of the fundamental liberty interests at stake in a parental-rights termination case, it is questionable whether a court can terminate one parent's parental rights to her child for failing to prevent the other parent from having contact with her.[6] At a minimum, to terminate Kara's parental rights based on her failure to prevent Sam from

---

[6]The language of Section 161.001(b)(1) supports this conclusion. Each of the other statutory grounds supporting termination of a parent's parental rights are based on that parent's acts or omissions, not on the parent's failure to control the acts or omissions of others. Section 161.001(b) provides,

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>> (1) **that the parent has**:
>>> (A) **voluntarily left the child alone** or in the possession of another not the parent and expressed an intent not to return;
>>> (B) **voluntarily left the child alone** or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;
>>> (C) **voluntarily left the child alone** or in the possession of another without providing adequate support of the child and remained away for a period of at least six months;
>>> (D) **knowingly placed or knowingly allowed the child to remain** in conditions or surroundings which endanger the physical or emotional well-being of the child;
>>> (E) **engaged in conduct or knowingly placed the child with persons** who engaged in conduct which endangers the physical or emotional well-being of the child;
>>> (F) **failed to support the child** in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;
>>> (G) **abandoned the child** . . . ;

23

contacting her, there must be some proof that she had the ability to prevent Sam's contact.[7]  The

record in this case not only fails to prove that she had that control, it strongly suggests that she did

not.

<div style="margin-left: 2em;">

     (H)     voluntarily, and with knowledge of the pregnancy, **abandoned the mother of the child**, . . . ;

     (I)     **contumaciously refused to submit** to a reasonable and lawful order of a court under Subchapter D, Chapter 261;

     (J)     **been the major cause of**:

        (i)     the failure of the child to be enrolled in school as required by the Education Code; or

        (ii)     the child's absence from the child's home . . . ;

     (K)     **executed** before or after the suit is filed **an** unrevoked or irrevocable **affidavit of relinquishment** of parental rights as provided by this chapter;

     (L)     **been convicted or has been placed on community supervision**, . . . for being criminally responsible for the death or serious bodily injury of a child . . . ;

     (M)     **had his or her parent-child relationship terminated** with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) . . . ;

     (N)     **constructively abandoned the child** who has been in the permanent or temporary managing conservatorship of [the Department];

    . . . .

     (P)     **used a controlled substance** . . . in a manner that endangered the health or safety of the child . . . ;

    . . . .

     (Q)     **knowingly engaged in criminal conduct** that has resulted in the parent's

        (i)     conviction . . . and

        (ii)     confinement or imprisonment . . . ;

     (R)     **been the cause of the child being born addicted** to alcohol or a controlled substance . . . ;

     (S)     **voluntarily delivered the child** to a designated emergency infant care provider . . . ;

     (T)     **been convicted** of [certain specified criminal offenses]; or

     (U)     **been placed on community supervision** . . . for being criminally responsible for [certain specified criminal offenses].

</div>

TEX. FAM. CODE ANN. §161.001(b) (Supp.) (emphasis added) (footnote omitted).

[7]It is true that Section 161.001(d) provides a defense to termination under Subsection (b)(1)(O) where the parent proves by a preponderance of the evidence that she "failed to comply with the [specific] provisions of a court order" and "made a good faith effort to comply with the order and the failure to comply [was] not attributable to any fault of the parent." TEX. FAM. CODE ANN. § 161.001(d) (Supp.).  It is also true that Kara did not assert this defense at trial. However, as we previously mentioned, we are not examining whether the evidence is sufficient to support the trial court's determination that Kara violated subsection (b)(1)(O). *See supra* note 1.  Rather, we are considering whether the evidence is sufficient to support the trial court's best-interest determination, and the nature of Kara's violation is

First, Finley and the foster mother both testified that they did not believe Kara had the ability to keep Sam from coming around. Kara's mother described Sam as "a pushy individual." She testified to an episode occurring shortly after Kara was committed to custody for contempt of court where Sam came to her house, demanded Kara's purse, looked through it, and then took it with him. While she denied being afraid of Sam, she explained, "[Sam's] just -- I don't know, he is like a bull in a china cabinet. He's just take charge, you know, he is just that kind of person." While she admitted she would have said no had the ad litem requested the purse, she did not "stand up to [Sam] and say no when he asked for the purse." Likewise, Finley testified that when Sam arrived uninvited at Kara's house during the unannounced visit, "he was very angry. He was very, like, threatening. He just -- it was just horrible." Accordingly, the evidence strongly suggests that Kara had no ability to make Sam stop having contact with her.

### 4. Even if Kara's Inability to Prevent Sam from Contacting Her Does Not Excuse Her Failure to Comply With the No-Contact Orders, There Are Facts that Mitigate Her Failure

Yet, even if Kara's inability to prevent Sam from contacting her could support termination of her parental rights, a relevant question is whether there are any mitigating facts that would tend to indicate termination of Kara's parental rights is still not in Harrison's best interest. I believe this record contains mitigating facts.[8]

relevant to that determination. Accordingly, it does not matter to our analysis that Kara did not plead and prove the defense in subsection (d).

[8]The majority provides a thorough analysis of the *Holley* factors in concluding that termination of Kara's parental rights is in Harrison's best interest. While I do not agree with the majority's conclusions in their entirety, I point out that the Supreme Court held in *Holley* that the list of factors identified there was "by no means exhaustive." *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Although the Supreme Court did not identify what other factors could exist, I believe one such factor is whether there is evidence mitigating the parent's actions such that—while not rising

25

A significant mitigating fact is that, although the trial court ordered that Sam have no contact with Harrison and that he could not be present during Kara's visitation periods, ***there is no evidence the Department ever requested or that the trial court ever issued an order prohibiting Sam from having any contact with Kara.***[9] Although Sam's visitation with Harrison was suspended until he presented himself in court, he was never prohibited from having contact with

to the level of a legal excuse—it is inappropriate to find that "the acts or omissions of the parent . . . may indicate [that] the existing parent-child relationship is not a proper one." *E.W.*, 494 S.W.3d at 300.

[9]All of the no-contact orders in this case were addressed only to Kara. The trial court entered twelve written orders in this case, but only five of the orders contained any prohibition against contact with Sam. Specifically, the trial court made the following written no-contact orders:

- February 21, 2018 – Sam is to have "no access to child until [Sam] comes to court."
- June 21, 2018 – "[Sam] cannot be present" during Kara's visitation.
- August 16, 2018 – "No contact with [Sam]."
- December 6, 2018 – "No contact with [Sam]."
- April 16, 2019 – "[Kara] is ordered to follow the court's orders and [Kara] is ordered to have no contact with [Sam]."

In addition, the trial court issued several verbal no-contact orders:

- August 16, 2018 – The trial court said, "We'll start the monitored return. No contact with [Sam]."
- November 21, 2018 – The trial court told Kara, "No [Sam] unless he comes to Court to see me. . . . If he shows up, you got to ask him to leave. Call the police so that you have a record."
- November 8, 2018 – the trial court told Kara, "You were taking the necessary and appropriate steps to be reunified with your child. And I'm sure somewhere along the way we talked about which one is more important to you, [Sam], who is not - - this is not a very important proceeding to him . . . ." The trial court then stated, "[Y]ou've jeopardized the health, safety, and welfare of the child by allowing this person that we've talked about being a danger to the child to be around him."
- December 6, 2018 – The trial court stated, "We'll go back to the June visitation schedule of standard visitation with the same limitations of no contact during that period of possession with [Sam] . . . ."
- January 31, 2019 – The trial court told Kara, "I'm going to reemphasize the no contact with [Sam] based on his failure to participate and to follow the Court's orders as well."
- March 7, 2019 – The trial court told Kara, "So, please continue with the no contact of [Sam], and I'll see you back then."

These written and verbal orders constitute the entirety of the trial court's no-contact orders. Although the specific wording of the orders does not make clear whether the trial court was prohibiting Kara from having any contact with Sam or whether Kara was prohibited from having any contact with Sam when she had possession of Harrison, the transcripts make clear that the participants understood that the prohibition was against Kara having any contact with Sam regardless of whether Harrison was present.

26

Kara when Harrison was not present. Sam failed to appear at every hearing but one and failed to perform any services required of him; therefore, I do not question the trial court's order suspending Sam's visitation with Harrison. Yet, the Department went no further than that. It did not seek an order prohibiting Sam from having contact with Kara. It did not seek an injunction or restraining order prohibiting Sam from having contact with Kara. It did not seek a protective order against Sam. *See* TEX. FAM. CODE ANN. § 261.501 (Supp.) (authorizing the Department to "file on application for a protective order for a child's protection . . . on the department's own initiative . . . ."). Nor did it assist Kara in obtaining a criminal trespass warning against Sam.

Consequently, the effect of the trial court's orders in this case is that Kara's parental rights were terminated, not because she violated the no-contact order herself by initiating contact with Sam, but ***because she failed to stop Sam from having contact with her when he was never ordered to do otherwise.*** Moreover, even if the trial court's no-contact orders could be interpreted as prohibiting Sam from having contact with Kara, there is no evidence that the Department sought enforcement of those orders against Sam. Rather, the Department simply expected Kara to ensure that Sam stayed away, even though it did not believe she possessed the ability to do so. Inasmuch as the Department seemed unable to make Sam appear and perform services, it is fair to ask how it expected Kara to prevent him from having contact with her? [10] Considering that Kara's alleged violation of the no-contact orders is the only basis for terminating her parental rights and that she

---

[10]It is true that Kara testified that she would be willing to call the Texarkana Police Department and have a criminal trespass warning issued to Sam. After she moved in with her mother, Kara testified that, if Sam showed up, she "would call the police." It could be argued that, based on this testimony, Kara did have the ability to ensure Sam's compliance with the no-contact order by calling the police and serving Sam with a criminal trespass warning. Yet, this evidence must be judged in the procedural context of this case. There is no evidence that Kara knew how to obtain a criminal trespass warning, nor was there any evidence that the Department even offered to assist her in doing so.

27

did everything else that was asked of her—to the extent we can say that she even violated those orders—I believe the Department's failure to restrain Sam from having contact with Kara mitigates Kara's alleged failure. Consequently, I do not believe that her failures were so serious as to "indicate the existing parent child relationship is not a proper one." *E.W.*, 494 S.W.3d at 300 (quoting *N.L.D.*, 412 S.W.3d at 818–19).

## IV. Did Kara Endanger Harrison's Health and Safety by Failing to Comply with the No-Contact Orders?

### A. Introduction

It could be argued that termination of a parent's parental rights for failing to comply with a no-contact order could still be in the child's best interest—even if the parent lacks the ability to comply with that order—if there is evidence that, by failing to comply with the order, the parent endangers the health or safety of the child. As the majority correctly points out, "protection of the child is paramount," *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))), and "[a] child's emotional and physical interests must not be sacrificed merely to preserve parental rights," *Id.* (citing *In re C.A.J.*, 459 S.W.3d 174, 179 (Tex. App.—Texarkana 2015, no pet.)). Nevertheless, given the fundamental liberty interests at stake, the necessity for protection of the child's "emotional and physical interests" must be based on clear and convincing evidence that those interests are actually endangered. It cannot be based on unsubstantiated concerns, unproven allegations, and rank hearsay such as that offered to the trial court in this case. To do so turns the "strong presumption that keeping a child with a parent is in the child's best interest" on its head. *E.W.*, 494 S.W.3d at 300 (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV,

2013 WL 782692 at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.)). Accordingly, we must decide whether the Department proved their concerns that Harrison was endangered by Sam's contact with Kara.

It must first be noted that the record reflects only one occasion when Sam was seen at Kara's house at the same time Kara had possession of Harrison. This occurred during the Department's September 14 unannounced visit when Sam showed up uninvited. Yet, there is no evidence that Sam was a danger to Harrison; in fact, there is no evidence that he even had any direct contact with Harrison at all. At best, the evidence merely shows that Sam and Harrison were both present in Kara's house at the same time. Thus, for us to find on this record that Kara's failure to prevent Sam from contacting her endangered Harrison's health and safety, the evidence must support one of the following conclusions: (1) Sam is a real or potential danger to Harrison's health and safety, and (2) by continuing to have contact with Sam, Kara will expose Harrison to the danger associated with being around Sam, or (3) that by being around Sam, Kara will herself become a danger to Harrison's health and safety. The record does not support any of these conclusions.

**B. The Record Does Not Support a Finding that Sam is a Potential Danger to Harrison's Health and Safety**

**1. Evidence Regarding Sam's Alleged Drug Use**

The actual witness testimony regarding Sam's alleged drug use is very thin. At the January 31, 2019, hearing, CASA representative Henderson testified about her initial concerns regarding Kara's ability to parent Harrison. She testified, "When I took over the case **just reading**

**the case** that she was -- had drug use and had [Sam] in her life who **apparently was not -- was also on drugs** and they were together, those are my initial concerns." (Emphasis added).

At the trial, Kara's mother testified that, to her knowledge, Kara had never been involved in any sort of illegal drug use at all prior to her relationship with Sam. However, she also testified that she never saw anything indicative of a drug lifestyle prior to her involvement with the Department in this case. She also testified that the only thing that she knows about a drug lifestyle is what she sees on television, and she never saw anything at all like that with Kara. She said that Kara had left behind Sam and all of the people involved in that lifestyle, but she also testified that she really did not know anything about Kara's addiction other than that she has one.

Kara's mother also testified that she did not blame Sam for this entire situation more than Kara. She testified, "[Kara] had her own mind. You choose that kind of situation." Also, she did not know how long Sam and Kara were in a relationship before the Department instituted this case. In the two years leading up to the case, she and Kara were not as close as they had been before. She testified, "[T]here was always the love but I didn't know -- I don't know her lifestyle. I did not know the lifestyle she was living."

In summary, the evidence from Henderson about Sam's alleged drug use is merely speculative. Clearly, she had no personal knowledge that Sam used drugs. Henderson testified that "apparently" Sam used drugs based on what she read in the case file. It might be inferred from the testimony of Kara's mother that Kara's drug use started when her relationship with Sam began, but she also testified that she had no knowledge of Kara's lifestyle prior to this case. Yet, even if the inference could be made that Kara's drug use started during that time, Kara's mother's

testimony does not support an inference that Sam used drugs with Kara or that he was the one who introduced Kara to them.

Therefore, if we are to find evidence of Sam's drug use, we must look to Kara's testimony. Kara testified that she had been in a relationship with Sam for two and one-half years before the case started and that she had been using methamphetamine for about two years. She also testified that she had used methamphetamine prior to her relationship with Sam. When she was nineteen years old, she used it once or twice, but she did not use it like she did until she met Sam. She testified that she used methamphetamine with her first boyfriend and that he and his friends provided the drugs to her. She lived with him in Texarkana, Texas, in a house he owned. She testified that when she was with Sam, she never used it by herself, nor did she ever obtain it by herself.

Yet, Kara did not testify that Sam used it with her, that Sam supplied it to her, or that Sam was the reason she started using it again. While this testimony might create a suspicion in the fact-finder's mind that Sam used methamphetamine and that Kara used it with and because of Sam, this suspicion is not evidence that "the fact-finder reasonably could have found to be clear and convincing" evidence. *L.E.S.*, 471 S.W.3d at 920. Consequently, the Department failed to establish clear and convincing evidence that Sam used drugs, that Sam supplied drugs to Kara, or that Sam was the reason Kara started using drugs again.

### 2. Evidence that Sam's Parental Rights to Other Children Had Been Terminated in Previous Cases

There is only one reference in the three volumes of testimony that Sam's parental rights to other children had previously been terminated. At the January 31, 2019, hearing Finley testified

that she had concerns about Harrison's safety around Sam "[d]ue to his previous terminations." There is no indication from any other witness about when, where, why, or how those "previous terminations" occurred. We do not know if they occurred as a result of an action by the Department or by private parties. We do not know if they were voluntary or involuntary. We do not know the basis for those terminations. This mere reference to "previous terminations" leaves us with nothing but rank speculation that they were involuntary terminations as a result of previous cases brought by the Department. This is certainly not clear and convincing evidence.

### 3. Evidence that Sam is a Potential Danger to Harrison

When we eliminate all of the non-evidentiary and unsworn accusations against Sam, the record reveals only three facts supported by **actual** evidence arguably establishing Sam's potential for harm to Harrison. First, Sam defaulted in this matter and failed to follow any of the trial court's orders or perform any services. Second, during an unannounced visit with Kara, Sam showed up uninvited, was angry, told Finley, "[Y]ou must not know who I am" and "I'm from the -- I can't remember, what ward he said, 5th ward or 6th ward," took her photo, and took a photo of her car. And third, when Kara was in jail on contempt of court in this matter, Sam went to Kara's house, asked to look through her purse, and Kara's mother let him—not because she was afraid of him, but because he was pushy. This is the entirety of the evidence presented to the trial court regarding Sam's potential for harm to Harrison.

To begin with, there is absolutely nothing in the record that explains how Sam's failure to perform services endangers Harrison's health and safety. While this certainly would justify termination of his parental rights, we cannot infer from that failure that Sam is in fact a danger to

32

Harrison so that we should affirm the termination of Kara's parental rights for failing to stop Sam from being around the child. Additionally, there is nothing about the episode involving Kara's purse that would explain how Sam is a danger to Harrison. Proof that he is a pushy thief is not proof that he is a child abuser or even a neglectful parent.

While it is certainly disturbing that Sam was threatening to the Department caseworker, does that constitute clear and convincing evidence that Sam is a danger to Harrison's health and safety? Finley herself said that she was not aware of any contact between Sam and Harrison other than the unannounced visit on September 14 when he showed up uninvited. Or does this evidence merely establish that Sam is threatening to people who are trying to terminate his parental rights to Harrison? A father could be a fit parent and threaten someone who seeks to take his child away from him. One thing does not necessarily prove the other.

It is not my intention to be an advocate for Sam in this case; I merely point out that the Department had the burden to prove its case by clear and convincing evidence and failed to do so. Based on this scant record, we are left only to speculate that Sam's words to Finley during the September 14, 2018, unannounced visit establish that he is a potential danger to Harrison. Such speculation is not evidence. Because this record does not support a conclusion that Sam is a potential danger to Harrison's health and safety, we cannot conclude that, by failing to prevent Sam from contacting her, Kara exposed Harrison to danger from Sam.

**C.    The Department Has Not Established that, by Violating the No-Contact Orders, Kara Will Herself Become a Danger to Harrison's Health and Safety**

**1.    The Admitted Evidence Does Not Support This Conclusion**

Finally, the evidence is insufficient to establish that, by violating the no-contact orders, Kara will herself become a danger to Harrison's health and safety. The majority states that, by being in contact with Sam, Kara risks relapsing inasmuch as she had remained off methamphetamine for twenty years until she met Sam. Yet, as demonstrated above, there is simply no evidence that Sam used drugs, that he supplied Kara with them, or that he was the reason she started using methamphetamine again. To hold that she risks relapse by her contact with Sam merely stacks one assumption on top of another, namely, (1) we assume that Sam is the reason she started using them again when she was forty and (2) we assume that, if Kara continues to have contact with Sam, she will start using methamphetamine in the future.[11] Consequently, because there is insufficient evidence that Sam even used drugs—let alone that he was the reason Kara started using again at age forty—there is no evidence upon which we can conclude that, by violating the no-contact orders, Kara will herself become a danger to Harrison's health and safety.

**2.    The Non-Admitted Information Does Not Support This Conclusion**

Nevertheless, in its summary of the evidence, the majority states that "[t]he trial court reflected on its notes from prior hearings before making its ruling and placed those notes in the record." Then, in its evaluation of the *Holley* factors, the majority goes on to state that "the trial

---

[11]It should be noted that, during the entire time this case was pending—and during the time the Department believed that Kara was having more contact with Sam than even those events testified to—Kara did not relapse. Accordingly, the evidence before the trial court undercuts the validity of this second assumption.

34

court's notes from an April hearing showed that Kara was still using drugs." To begin with, the trial court never designated its notes as an exhibit that was admitted into evidence. Rather, the trial court merely summarized them orally. Thus, we do not know what the trial court's notes actually say. Yet, even if we assume that the trial court "placed those notes into the record" by summarizing them in open court, there are several problems with the majority's reliance on those notes to support its opinion.

First, the record indicates that the trial court's notes were from the April 2018 status hearing. As noted above, the transcript of that hearing was not entered into evidence and therefore may not be considered by us. *E.W.*, 494 S.W.3d at 297. If the official transcript of that hearing could not be considered because it was not admitted into evidence, then the trial court's notes of what was said during that hearing is even less available for consideration. Second, the transcript of the April 2018 hearing establishes that the information cited by the trial court did not come from sworn testimony by any witness, but from the Department's attorney's opening remarks to the trial court. What the attorneys say to the trial court is not evidence.

Third, and most importantly, a review of the Department's attorney's statement not only does not support the conclusion reached by the trial court that Kara was still using drugs, it actually suggests the opposite conclusion.

> [DEPARTMENT'S COUNSEL]: . . . Mom is making progress on her service plan. She has got registered for parenting. She has done her psycho/social, she has gone to counseling, she has completed her ETCADA evaluation and is attending her visits mostly. She has had to cancel a few of them, but -- which is two hours per week at the department. At this point her hair is still –
>
> THE COURT: I have four hours a week two times.

35

[DEPARTMENT'S COUNSEL]: Oh, I'm sorry, two hours twice per week. So, at this point her hair is still positive for marijuana and meth, ***but her UA's have been negative.***

(Emphasis added). Consequently, the trial court's notes contained (1) incorrect conclusions based on (2) the Department's attorney's opening statement to the trial court, which (3) summarized the results of drug tests that were never entered into evidence, and (4) that were, at best, inconclusive and, at worst, suggested the opposite conclusion. Those notes do not constitute evidence that Kara will become a danger to Harrison's health and safety.

### C.    Summary

In short, neither the evidence admitted during the trial, nor the trial court's notes, which were not admitted, support the conclusion that Kara will become a danger to Harrison's health and safety by violating the no-contact orders.

## V.    Conclusion

Finally, the majority notes that the "best interest analysis may [also] consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence." *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). While this is a correct statement of the law, "circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence" cannot convert insufficient evidence into clear and convincing evidence. *Id.* When we look at what the Department actually introduced into evidence at the trial, it is clear that the evidence in this case falls short of clear and convincing evidence.

The thing that concerns me most about this case is the Department's almost cavalier approach to terminating Kara's parental rights. It made serious, unsworn allegations about Sam

to the trial court during review and status hearings,[12] but then it failed to present any actual evidence to support those allegations.  In essence, the Department asked the trial court to "just take its word for it" that Sam was a bad and dangerous person.  Then, based on that assumption, the Department requested "no contact orders" that it did not believe Kara could comply with, took no steps whatsoever to prevent Sam from contacting her, and then argued that the inevitably resulting contact justified terminating Kara's parental rights.  And on appeal, it asks us to defer to the trial court's decision.  The Department's approach almost seems to be that "the trial court should rubber-stamp [the Department's] decision, and this Court should rubber-stamp the trial court's decision."

I wish to be clear that I do not question the majority's good faith in reaching a different conclusion than I do in this case.  I know that the majority gave this case the same sincere and in-depth consideration it does in every case.  Nor do I question the good faith of the Department in pushing for—or the trial court for ordering—termination of Kara's rights.  I know that the trial court and the Department are burdened with a lengthy docket of such cases, and it must feel at times that they are asked to bail out the ocean with a teacup.  The sheer number of cases they are dealing with prevents the kind of detailed and in-depth litigation that I am sure they wish they could provide in every case.

---

[12]For example, at the review hearing held on November 21, 2018, the Department's counsel reported to the trial court that Father "**has had his rights terminated in the past to other children**" and that "**he does have a drug problem.**" (Emphasis added).  At the subsequent permanency hearing held on November 8, 2018, the Department's counsel reported to the trial court, "**the concern again is that she continues to allow [Father], who has been terminated on his other children, is a meth user,** and we cannot allow [Kara] to be around this child if she's going to continue to be around him." (Emphasis added).  And at a pretrial hearing held December 6, 2018, the Department's counsel reported to the trial court that Father "**has been terminated to other children**." (Emphasis added).  As noted above, there is virtually no evidence that supports these serious allegations in the actual record at trial.

But almost fifty years ago, the United States Supreme Court, in striking down a presumption that unwed fathers are unfit parents, warned about the threat to the "fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials . . . ." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). And almost forty years ago, the Supreme Court ruled that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982). If we truly apply that standard in this case—as well as the procedural rules that govern what portions of an appellate record may be considered in doing so—I believe we must reverse the trial court's judgment and render judgment for Kara. In my opinion, to do anything else erodes the clear and convincing evidence standard designed to protect against an improper imposition of the most severe sanction available in a civil case.

Therefore, I respectfully dissent.


Ralph K. Burgess
Justice


Date Submitted: February 26, 2020
Date Decided: April 1, 2020

38